**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**March 8, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

---

WENDY COUSER, individually and
as administrator of the ESTATE OF
MATTHEW HOLMES,

       Plaintiff – Appellant,

v.

CHRIS SOMERS,

       Defendant – Appellee.

No. 23-3041
(D.C. No. 6:18-CV-01221-JWB)
(D. Kan.)

---

## ORDER AND JUDGMENT[*]

---

Before **HARTZ, TYMKOVICH,** and **ROSSMAN**, Circuit Judges.

---

    This appeal arises out of the tragic death of Matthew Holmes, who was fatally shot by Officer Chris Somers in August 2017. Mr. Holmes's mother, Wendy Couser, individually and as administrator of Mr. Holmes's estate, sued Officer Somers in federal district court in Kansas under 42 U.S.C. § 1983, alleging a Fourth Amendment excessive-force claim. The district court granted Officer Somers qualified immunity and resolved the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, *res judicata*, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

case against Ms. Couser on summary judgment. Exercising jurisdiction under 28 U.S.C. 1291, we affirm.

## I[1]

We first discuss the factual background, focusing on the events leading to Mr. Holmes's death, and the procedural history of the ensuing litigation in the district court. We then outline the governing legal principles and analyze Ms. Couser's appellate challenges. As we explain, we discern no reversible error.

## A

One night in late August 2017, law enforcement received a call that Mr. Holmes was burglarizing a car in Newton, Kansas. When officers encountered Mr. Holmes, he led them on a high-speed chase, reaching speeds of 70 to 100 miles per hour. Officers deployed a spike strip that pierced Mr. Holmes's front tires, but Mr. Holmes continued driving, now more slowly, for about 14 minutes. It was around that time dispatch advised Officer Somers of the pursuit, and he joined the chase. Mr. Holmes eventually stopped the car in the grass median of an interstate highway in

---

[1] We take the facts recited here from the record before the district court on summary judgment. There is significant body camera and dash camera video footage from the night of Mr. Holmes's death, which was also designated in the appellate record. We have reviewed that footage and reference it throughout our discussion.

2

McPherson County, Kansas. He was in the driver seat, with a passenger seated up front.

After Mr. Holmes stopped in the median, multiple officers surrounded the car.[2] Corporal Anthony Hawpe, a K-9 officer with the Newton Police Department, kneeled several feet away from Mr. Holmes's car on the driver's side.[3] Officer Somers positioned himself behind Corporal Hawpe. Somers Body Cam. at 00:00–15. Both Corporal Hawpe and Officer Somers repeatedly yelled for Mr. Holmes to exit the car and put his hands up. Somers Body Cam. at 00:31–1:07.

For about three minutes, Mr. Holmes remained in the car, told officers he would not get out, and shouted obscenities. Mr. Holmes then reached out the window and opened the driver-side door. Somers Body Cam. at 1:04–11. Mr. Holmes climbed out of the car and stood with his hands at his sides. He had no weapon and did not move towards the officers. Somers Body Cam. at 1:11–15.

---

[2] Law enforcement officers from the City of Newton, Harvey County, and McPherson County were present on the scene.

[3] Ms. Couser initially sued Corporal Hawpe for his actions on the night of Mr. Holmes's death, but the parties ultimately entered a stipulation of dismissal. App. IV at 1030 n.7. Officer Somers is the only defendant in this case.

At that point, Officer Somers holstered his gun and drew his Taser. Gayer Body Cam. at 00:05–10. Corporal Hawpe and Officer Somers, along with the remaining officers at the scene, ordered Mr. Holmes to get on the ground. Mr. Holmes did not comply and shouted back at them—yelling "shoot me" several times. Officer Somers fired his Taser at Mr. Holmes. Somers Body Cam. at 1:13–20. In rapid succession, Officer Jason Achilles, on Officer Somers's command, shot non-lethal bean bags rounds at Mr. Holmes.[4] App. IV at 1030 n.6. On the body camera video, Mr. Holmes appeared unaffected but stepped back slightly. Somers Body Cam. at 1:10–18. About three seconds later, Corporal Hawpe, who was closest to Mr. Holmes, gave his canine a command, and the dog rushed Mr. Holmes. Hawpe Body Cam. at 23:52–58. Mr. Holmes kicked near the dog's head, and it ran away.

Corporal Hawpe then holstered his gun on his right hip and approached Mr. Holmes. Gayer Body Cam. at 00:17. As Corporal Hawpe

---

[4] The district court found Officer Somers shot his Taser and Officer Achilles fired the bean bag rounds "[a]t about the same time[.]" App. IV at 1030. The district court noted Ms. Couser insists Officer Somers fired his Taser first. Our review requires us to consider the evidence in Ms. Couser's favor at this stage of litigation, *see Estate of Taylor* v. *Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021), and we credit her view of the sequence of events. But we ultimately agree with the district court that the order here "is not significant" because the events occurred rapidly, one after the other. App. IV at 1030 n.6.

advanced, officers again commanded Mr. Holmes to get down on the ground, but he remained standing next to the car.[5]

Suddenly, Corporal Hawpe charged Mr. Holmes and grabbed at his neck. Gayer Body Cam. at 00:18–25. Corporal Hawpe then kneed Mr. Holmes's groin before throwing him to the ground. Gayer Body Cam. at 00:18–25. Mr. Holmes landed on his right side with his right arm beneath him. Gayer Body Cam. at 00:18–25. Corporal Hawpe also fell and landed on top of Mr. Holmes. Gayer Body Cam. at 00:18–25. On the ground, Mr. Holmes wrapped his left arm around Corporal Hawpe's midsection. In the video footage, Mr. Holmes's elbow is raised slightly above the gun holstered on Corporal Hawpe's right hip. Gayer Body Cam. at 00:26–30. Officer Somers then holstered his Taser and approached. Gayer Body Cam. at 00:24–26. He grabbed Mr. Holmes's left wrist and elbow, while another officer grabbed Mr. Holmes's legs. Gayer Body Cam. at 00:26–30; Somers Body Cam. at 1:29.

The events that unfolded next lasted only a few seconds and led to Mr. Holmes's death. Still rolling on the ground with Mr. Holmes, Corporal

---

[5] Officer Somers contends Mr. Holmes adopted a "fighting stance," Aplee. Br. at 22, 26, but that description is contradicted by the video, which shows Mr. Holmes standing still with his arms at his sides. Somers Body Cam. at 1:02–25.

Hawpe yelled, "watch my gun, watch my gun." Gayer Body Cam. at 00:27–35; Hawpe Body Cam. at 24:00–05. Officer Somers responded, "he's going for your gun?" App. II at 320. Almost simultaneously, someone said, "I got it, I got it."[6] Hawpe Body Cam. at 24:00–07. About two seconds later, Officer Somers fired a single round into the center of Mr. Holmes's back. Gayer Body Cam. at 00:27–35.

Immediately after shooting Mr. Holmes, Officer Somers can be heard on the video footage saying, "[h]e was reaching for the gun." Somers Body Cam. at 1:34–41. Officer Somers also asked Corporal Hawpe if he was

---

[6] Nothing in the record confirms who said "I got it, I got it," but there is no dispute someone said those words. At his deposition, Officer Somers claimed he heard someone say, "I got it, I got it," but did not know who said it or what "it" means, as it could mean "so many numerous things." App. II at 320. In his video recorded statement to investigators right after the shooting, however, Officer Somers did not mention hearing those words.

In the district court, Officer Somers maintained he heard someone say, "I got it, I got it" before he used lethal force (he takes the same position on appeal). But Ms. Couser highlighted Officer Somers's inconsistent statements and insisted a jury should decide what Officer Somers actually heard. In resolving the cross-motions for summary judgment, the district court, "[v]iewing the evidence in a light most favorable to [Ms. Couser]," determined "it [was] disputed whether Somers heard the unknown individual say 'I got it' at the time of the incident." App. IV at 1032. The district court then analyzed the record as though Officer Somers *did not hear* someone say, "I got it, I got it." We do the same. A contrary construction of the disputed evidence—advanced by Officer Somers on appeal, perhaps to reinforce the objective reasonableness of his belief—is impermissible at this procedural stage.

alright and whether Mr. Holmes "g[o]t his gun[.]" Gayer Body Cam. at 00:55–01:05. Mr. Holmes died at the scene.

## B

Ms. Couser filed her Second Amended Complaint in February 2021. She alleged Officer Somers used excessive force in violation of Mr. Holmes's Fourth Amendment rights under 42 U.S.C. § 1983. Following discovery, both parties moved for summary judgment.

Officer Somers asserted he was entitled to qualified immunity. Ms. Couser could not establish a constitutional violation, Officer Somers argued, because his use of deadly force was objectively reasonable under *Graham* v. *Connor*, 490 U.S. 386, 396–97 (1989). Marshaling the *Graham* factors, Officer Somers emphasized Mr. Holmes committed a felony, then eluded the officers on a high-speed chase, and when he finally stopped his car, resisted arrest by repeatedly ignoring officer commands and struggling with law enforcement after being apprehended. Officer Somers maintained it was objectively reasonable, particularly given the rapidly-unfolding events, to believe Mr. Holmes "was going for Hawpe's gun [and] present[ed] an imminent threat." App. I at 237–39 (discussing the factors in *Estate of Larsen ex rel. Sturdivan* v. *Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)). Officer Somers also argued that, on the night of the shooting, the law was not clearly established that "the use of force in a sufficiently similar

situation was unconstitutional as required to defeat qualified immunity."
App. I at 244.

Ms. Couser urged the district court to deny qualified immunity.
Officer Somers knew Mr. Holmes was unarmed when he shot and killed
him. And Officer Somers must have known Mr. Holmes was "nowhere near
Hawpe's holster" because he had control of Mr. Holmes's left hand and arm
during the struggle. App. I at 274. Officer Somers violated the Fourth
Amendment, she insisted, and the law was clearly established at the time
of the alleged constitutional violation.

The district court granted qualified immunity to Officer Somers.
Applying the familiar two-part framework, the district court concluded
Ms. Couser had not met her burden on either prong. First, the district court
agreed with Officer Somers it was objectively reasonable to believe
Mr. Holmes was attempting to grab Corporal Hawpe's gun and thus posed
an immediate threat to officer safety. Second, even assuming a Fourth
Amendment violation, Ms. Couser failed to show the law was clearly
established. Ms. Couser relied on "general precedent" about "particularly
egregious" Fourth Amendment violations, the district court reasoned, but
identified no case from the Supreme Court or the Tenth Circuit showing
"how the facts in this case rise to such an egregious violation." App. IV
at 1053.

Ms. Couser timely appealed.

## II

We review "grants of summary judgment based on qualified immunity de novo." *Estate of Taylor* v. *Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021) (quoting *McCoy* v. *Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). The legal framework is well established. "Government officials sued under 42 U.S.C. § 1983 are entitled to qualified immunity unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Roberts* v. *Winder*, 16 F.4th 1367, 1373–74 (10th Cir. 2021) (quoting *District of Columbia* v. *Wesby*, 583 U.S. 48, 62–63 (2018)). After a defendant invokes qualified immunity at summary judgment, the "plaintiff must satisfy [the] two-part [qualified immunity] inquiry." *Arnold* v. *City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022); *see also Riggins* v. *Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) ("When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion."). While the plaintiff bears this burden, we must still "view the facts and any reasonable inferences in the light most favorable to the non-moving party." *Arnold*, 35 F.4th at 788. "[T]his usually means adopting . . . the plaintiff's version of the facts." *Estate of Taylor*, 16 F.4th at 756 (quoting *Scott* v. *Harris*, 550 U.S. 372, 378 (2007)).

The district court addressed both components of the qualified immunity inquiry, as do the parties on appeal. "We have discretion 'to decide the order in which to engage the[] two prongs of the qualified immunity standard.'" *Andersen* v. *DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (quoting *Estate of Taylor*, 16 F.4th at 758). "If we conclude that the plaintiff has not met [her] burden as to either part of the two-prong inquiry, we must grant qualified immunity to the defendant." *Id.* As we explain, Ms. Couser has not shown a constitutional violation on this record, so we affirm without reaching the clearly-established prong. *See Estate of Taylor*, 16 F.4th at 758 (reasoning we need not address the second qualified immunity prong if a plaintiff cannot overcome the first prong).

### III

Ms. Couser contends a reasonable jury could find Officer Somers violated Mr. Holmes's Fourth Amendment rights by using deadly force. Aplt. Br. at 31.[7] The district court concluded otherwise, and under the standards that guide our review, we must agree.

---

[7] Ms. Couser maintains for the first time on appeal that *Graham* and *Larsen* are inapplicable to situations involving *deadly* force. Aplt. Br. at 26–30. Ms. Couser did not raise this argument before the district court; rather, she relied on *Graham* and *Larsen* without objection in her summary judgment briefing. App. I at 274–76; App. IV at 899–911; *Richison* v. *Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) (explaining if a "theory simply wasn't raised before the district court, we usually hold it forfeited"). And on appeal, Ms. Couser does not argue we should review for plain error.

## A

"To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable.'" *Thomas* v. *Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (quoting *Childress* v. *City of Arapaho,* 210 F.3d 1154, 1156 (10th Cir. 2000)). An individual's "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee* v. *Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment's controlling analytical framework is objective reasonableness. *Graham,* 490 U.S. at 395; *Estate of Taylor*, 16 F.4th at 759 ("To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable." (quoting *Estate of Larsen*, 511 F.3d at 1259)). "Under this standard, we carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Andersen*, 79 F.4th at 1163 (quoting *Cavanaugh* v. *Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010)) (internal quotation marks omitted).

Our inquiry is holistic—considering the "totality of the circumstances," *Estate of Larsen*, 511 F.3d at 1260—and objective,

---

Under our precedents, that marks the end of the road for this issue in this appeal.

disregarding officers' subjective "underlying intent or motivation," *Graham*, 490 U.S. at 397. To discern objective reasonableness in the excessive-force context, we consider the three factors from *Graham*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Reavis ex rel. Estate of Coale* v. *Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (discussing the *Graham* factors). "The *Graham* factors are nonexclusive and not dispositive[.]" *Palacios* v. *Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023). We must "pay 'careful attention to the facts and circumstances of [the] particular case.'" *Sevier* v. *City of Lawrence,* 60 F.3d 695, 699 (10th Cir. 1995) (quoting *Graham,* 490 U.S. at 396).

The second *Graham* factor is "undoubtedly 'the most important' and fact intensive." *Pauly* v. *White*, 874 F.3d 1197, 1216–19 (10th Cir. 2017) (quoting *Bryan* v. *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). In our assessment of whether the plaintiff posed an immediate threat, we must look at "whether the officers [or others] were in danger at the precise moment that they used force . . . ." *Sevier*, 60 F.3d at 699; *see id.* ("Defendants' use of deadly force was justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm

to themselves or to others."). In such circumstances, "a reasonable but mistaken belief that the suspect is likely to fight back justifies using more force than is actually needed." *Thomson* v. *Salt Lake Cnty.*, 584 F.3d 1304, 1315 (10th Cir. 2009); *Reavis*, 967 F.3d at 988 ("[T]he question of whether there is no threat, an immediate deadly threat, or that the threat has passed, at the time deadly force is employed must be evaluated based on what a reasonable officer would have perceived under the totality of the circumstances."). And, as we have said before, "a reasonable officer need not await the glint of steel before taking self-protective action." *Estate of Larsen*, 511 F.3d at 1260.

The understandable allowance in our Fourth Amendment jurisprudence for the perspective of a reasonable officer on the scene, however, "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Cordova* v. *Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009). In assessing whether a reasonable jury could find the suspect posed an immediate threat, we consider "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. The

*Larsen* factors are "only aids in making the ultimate determination [under *Graham*], which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Tenorio* v. *Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015) (quoting *Estate of Larsen*, 511 F.3d at 1260).

**B**

We take the *Graham* analysis out of order, beginning with Ms. Couser's arguments about the first and third *Graham* factors and then turning to the second *Graham* factor.

**1**

Ms. Couser challenges the severity of Mr. Holmes's alleged crimes, contending the first *Graham* factor counsels in her favor. The offense leading to the car chase was "a property crime" which Ms. Couser claims is less serious than "a personal injury crime." Aplt. Br. at 32–33. Ms. Couser's argument relies on a comparative assessment of offense severity and is foreclosed. "[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette* v. *K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).

Here, Mr. Holmes's alleged crimes were felonies under Kansas law. There is no dispute Mr. Holmes was suspected of burglarizing a vehicle.

Burglary is a felony in Kansas. Kan. Stat. Ann. § 21-5807(c); *see also id.*
§ 21-5807(a)(3) (stating burglary is entering into a vehicle, without
authority, intending to commit a theft). There is likewise no dispute
Mr. Holmes then led law enforcement on a lengthy, high-speed chase.
Fleeing and eluding under these circumstances is also a felony in Kansas.
*See id.* § 8-1568(b)(2), (c)(2) (stating the attempt "to elude capture for the
commission of any felony" by "knowingly fail[ing] or refus[ing] . . . to
stop, . . . when given a visual or audible signal to bring the vehicle to a stop"
is a felony in its own right). We thus conclude, as the district court did, the
first *Graham* factor favors Officer Somers.

Next, Ms. Couser argues the third *Graham* factor supports reversal
because Mr. Holmes was not actively resisting arrest or attempting to evade
arrest by flight at the precise moment deadly force was used.[8] We cannot

---

[8] The "key focus of our analysis" in excessive force cases is "the precise
moment that lethal force was used," but we have acknowledged "the Fourth
Amendment excessive-force inquiry is not limited to such moments." *Estate
of Taylor*, 16 F.4th at 771. Applying the *Graham* factors to conduct which is
immediately connected to the use of deadly force is generally appropriate
when "[t]he reasonableness of the use of force depends not only on whether
the officers were in danger at the precise moment that they used force, but
also on whether the officers' own reckless or deliberate conduct during the
seizure unreasonably created the need to use such force." *Pauly*, 874 F.3d
at 1219 (quoting *Jiron* v. *City of Lakewood*, 392 F.3d 410, 415 (10th Cir.
2004)) (internal quotations omitted). Officer Somers's actions did not create
the need to use lethal force. No party suggests otherwise. We maintain our
focus, therefore, on the precise moment lethal force was used.

agree. Even if we assume, as Ms. Couser argues, Mr. Holmes was not evading arrest, we also must consider whether he was actively resisting arrest at the precise moment he was shot. *See Graham*, 490 U.S. at 396 (requiring us to consider "whether [a suspect] is actively resisting arrest *or* attempting to evade arrest by flight" (emphasis added)); *see also Andersen*, 79 F.4th at 1165 ("[W]hen evaluating the third [*Graham*] factor we consider whether the plaintiff [was] . . . actively resisting at the precise moment the officer employed the challenged use of force." (alteration adopted) (internal quotations and citation omitted)); *Perea* v. *Baca*, 817 F.3d 1198, 1203–04 (10th Cir. 2016) (focusing the analysis of the third *Graham* factor only on whether the plaintiff was actively resisting arrest when officers used lethal force).

Here, the record shows Mr. Holmes was actively resisting arrest when Officer Somers fatally shot him. Officer Somers testified Corporal Hawpe and Mr. Holmes "were actively fighting each other" as they tussled on the ground, and Corporal Hawpe testified he and Mr. Holmes "fought with each other and . . . both fell to the ground." App. II at 319, 465. The video footage, viewed in the light most favorable to Ms. Couser, does not show otherwise. Gayer Body Cam. at 00:20–30.

When Corporal Hawpe tackled him, Mr. Holmes wrapped his arms around Corporal Hawpe. As Mr. Holmes and Corporal Hawpe rolled on the

16

ground, Corporal Hawpe struggled to position himself to gain control over Mr. Holmes. The video footage shows Mr. Holmes scuffled with Corporal Hawpe from the moment they hit the ground until the moment Officer Somers shot him. Gayer Body Cam. at 00:20–35.

Still, Ms. Couser insists a reasonable jury could view the record differently. She claims the video footage shows officers had control over Mr. Holmes when he was shot. Under these circumstances, she contends it was objectively unreasonable to use lethal force because Mr. Holmes was restrained—and thus not actively resisting arrest.

As a general matter, Ms. Couser's argument proceeds from a legally sound premise. We have held it is objectively unreasonable to use force against a suspect who is not resisting arrest. *See, e.g.*, *Emmett* v. *Armstrong*, 973 F.3d 1127, 1136–37 (10th Cir. 2020) (holding use of force was objectively unreasonable when an officer tased a suspect after tackling him to the ground, while he was on his back, and visibly relaxed and laughing); *McCoy* v. *Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (holding use of force was objectively unreasonable when officers "struck [suspect] more than 10 times and placed him in a carotid restraint" as the suspect regained consciousness); *Davis* v. *Clifford*, 825 F.3d 1131, 1135–36 (10th Cir. 2016) (holding use of force was objectively unreasonable when officers smashed suspect's driver-side window and pulled her out of the window by her hair

and arms after her car was totally blocked by police vehicles); *Perea*, 817 F.3d at 1203–04 (holding use of force was objectively unreasonable when officers tased suspect already under their control); *Weigel* v. *Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) (holding use of force was objectively unreasonable when officers applied pressure to the suspect's upper body and neck after he was handcuffed, bound, and had another officer restraining his legs).

But on this record, we see no basis to conclude Mr. Holmes was restrained (and not resisting) when Officer Somers used lethal force. Though Ms. Couser maintains otherwise, her version of the facts is not supported by the evidence. *Estate of Taylor* at 758 n.5 (noting that "courts accept a plaintiff's *evidence-supported version of the facts* in resolving [factual] disputes" on summary judgment) (emphasis added)).

We thus agree with the district court that the third *Graham* factor supports Officer Somers.

## 2

We now turn to the second *Graham* factor. Ms. Couser urges reversal because, in her view, it was objectively unreasonable for Officers Somers to believe Mr. Holmes posed an immediate threat to the physical safety of the officers when he was shot. Ms. Couser specifically faults the district court's reasoning under the *Larsen* factors. We consider each of her arguments in

18

turn, "[r]esolving all factual ambiguities and reasonable inferences in [Ms. Couser's] favor." *Estate of Taylor*, 16 F.4th at 765. As we explain, we discern no error in the district court's conclusion under the second *Graham* factor.

First, Ms. Couser argues Mr. Holmes did not have a weapon, so the first *Larsen* factor—whether the officers ordered the suspect to drop his weapon, and the suspect's noncompliance with police commands—weighs in her favor. It is true Mr. Holmes was unarmed, as the district court acknowledged. This certainly lessened the threat Mr. Holmes presented. But in assessing the first *Larsen* factor, we recently held "[i]f a suspect was given orders and did not comply, this weighs in the officers' favor." *Palacios*, 61 F.4th at 1259; *see also Estate of Taylor*, 16 F.4th at 765–66 (holding first *Larsen* factor supported officer where "the record clearly establishe[d] that [unarmed suspect] ignored or directly disobeyed [officers'] commands"). And we must always take into account the "totality of the circumstances," *Estate of Larsen*, 511 F.3d at 1260. We thus proceed to consider Mr. Holmes's failure to comply with police commands as part of our inquiry.[9]

---

[9] In applying the first *Larsen* factor in favor of Officer Somers, the district court reasoned, though Mr. Holmes was unarmed, "the Tenth Circuit has held that in such a circumstance, the court considers whether [Mr.] Holmes was complying with the officers' commands." App. IV at 1042 (citing *Estate of Taylor*, 16 F.4th at 766). We have not squarely decided whether the first *Larsen* factor necessarily applies in such a circumstance.

19

Here, the record demonstrates Mr. Holmes's continuous noncompliance with police commands. As the district court correctly observed, "the officers gave repeated and continuous commands to Holmes while he was in the car and after he got out of the car." App. IV at 1043. Mr. Holmes at times "complied with the commands to raise his hands, [but] he also repeatedly lowered his hands." App. IV at 1043. When he exited the car, "he did so with his hands down by his sides; again, failing to comply with the commands to raise his hands." App. IV at 1043. The officers at the scene repeatedly ordered Mr. Holmes to get on the ground. He refused and remained standing until Corporal Hawpe tackled him.

While on the ground, Mr. Holmes struggled with Corporal Hawpe, in defiance of officers' commands to submit. Until the moment he was shot, Mr. Holmes continued to wrap his left arm around Corporal Hawpe's

---

To be sure, in *Palacios*, we stated without qualification "[i]f a suspect was given orders and did not comply, [the first *Larsen*] factor weighs in the officers' favor." *Palacios*, 61 F.4th at 1259. But there, unlike here, the suspect had a gun. *Id.* at 1254–55, 1259. And in *Estate of Taylor*, where the first *Larsen* factor counseled in favor of the officers, the suspect was unarmed but officers reasonably believed he was holding a weapon at the time he was shot and killed.

Ms. Couser has not argued the district court made a legal error in concluding the first *Larsen* factor requires an assessment of noncompliance with police commands when there is no dispute the suspect is unarmed. Guided by the parties' arguments, we leave that question for another day.

midsection, even while other officers tried to restrain him. Gayer Body Cam. at 00:24–30. On this record, properly construed in favor of Ms. Couser, we cannot say the first *Larsen* factor wholly supports her position.

Ms. Couser next challenges the district court's conclusion on the second *Larsen* factor—whether any hostile motions were made with the weapon towards the officers. According to Ms. Couser, Mr. Holmes did not have a weapon and "took no hostile actions or motions towards the officers." Aplt. Br. at 60. The district court acknowledged Mr. Holmes was unarmed and never obtained Corporal Hawpe's weapon but disagreed that Mr. Holmes made no hostile motions during the encounter. Under these circumstances, the district court concluded the second *Larsen* factor was "not applicable." The district court reasoned, "the facts relating to the struggle with Hawpe on the ground and the perceived threat involving Hawpe's weapon" were addressed "under the other factors." App. IV at 1044.

The district court did not err in this respect. The *Larsen* factors are a non-exhaustive list of considerations, not an obligatory checklist, and are "only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Tenorio*, 802 F.3d at 1164 (quoting *Estate of Larsen*, 511 F.3d at 1260); *Estate of George* v. *City of Rifle*, 85 F.4th 1300, 1317 (10th Cir. 2023) (recognizing "[t]he *Larsen* factors are

'non-exclusive' and we must always consider 'the totality of the circumstances.'" (quoting *Estate of Larsen*, 511 F.3d at 1260)). Here, the district court reasonably determined the second *Larsen* factor did not aid the assessment of the ultimate question: whether, under the totality of circumstances, it was objectively reasonable for Officer Somers to believe Mr. Holmes posed an immediate threat to the safety of officers or others when deadly force was used. And the district court properly considered other facts more relevant to assessing objective reasonableness on this record.[10]

As to the third *Larsen* factor—the distance separating the officers and the suspect—Ms. Couser argues "[t]he officers had significant distance between themselves and [Officer] Somers." Aplt. Br. at 60. The district court correctly rejected this argument because it is blatantly contradicted by the record. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

---

[10] Even if we assume the second *Larsen* factor favors Ms. Couser, the overall calculus of objective reasonableness remains unaffected, as we explain.

Body camera footage from several angles shows Mr. Holmes rolling on the ground with Corporal Hawpe directly on top of him and other officers in close proximity. Gayer Body Cam. at 00:18–25; Somers Body Cam. at 1:20–25. The district court reasoned, "[c]ontrary to [Ms. Couser's] assertion, the close distance weighs in favor of a finding of an imminent threat to Hawpe. Holmes and Hawpe were struggling on the ground and Holmes made no discernible effort to cease his resistance." App. IV at 1044. "This short distance heightens the danger to Hawpe," the district court determined, "especially because he would be in imminent danger should Holmes obtain Hawpe's weapon." App. IV at 1044. Ms. Couser has not explained why her version of the facts on this point withstands scrutiny. *Cf. Becker* v. *Bateman*, 709 F.3d 1019, 1025–26 & n.6 (10th Cir. 2013) (concluding because reasonable jurors could draw multiple inferences from video footage, the district court was wrong to grant summary judgment, and observing that by specifically rejecting one possible inference the court "improperly weighed the evidence and failed to draw all reasonable inferences in favor of the non-moving party").

Next, Ms. Couser argues the fourth *Larsen* factor—the manifest intentions of the suspect—weighs in her favor. She insists the record shows Mr. Holmes never intended to harm the officers. The district court concluded otherwise. "Based on the video and the officers' testimony," the

district court said, "a reasonable officer would view Holmes' conduct during the altercation as trying to overpower Hawpe." Drawing all factual inferences in Ms. Couser's favor, we agree with the district court.

In *Taylor*, we explained our focus under the fourth *Larsen* factor is "on how a reasonable officer on the scene would have assessed the manifest indicators of [the suspect's] intentions—that is, [the suspect's] actions." *Estate of Taylor*, 16 F.4th at 770. "The term 'manifest' is of central importance to the understanding and application of this factor. The term is consonant with the oft-stated, objective nature of the Fourth Amendment reasonableness analysis." *Id.* We thus remain mindful that the "Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts . . . have no proper place in that inquiry." *Graham*, 490 U.S. at 399; *see also Anderson* v. *Creighton*, 483 U.S. 635, 641 (1987) (holding that an officer's subjective belief about his conduct is "irrelevant" for qualified immunity purposes).

Applying these principles, the district court did not err in concluding the fourth *Larsen* factor supported Officer Somers. After Corporal Hawpe threw Mr. Holmes to the ground, Mr. Holmes did not give himself up for arrest. He continued resisting as the two rolled on the ground. Officer Somers witnessed this struggle and heard Corporal Hawpe yell, "watch my gun, watch my gun." Gayer Body Cam. at 00:27–35. Under these

circumstances, Mr. Holmes's actions, at the precise moment Officer Somers used lethal force, cannot reasonably be viewed as manifesting a non-threatening intention.

Finally, Ms. Couser generally urges reversal, contending the record shows officers recklessly escalated the situation to require the use of deadly force. Ms. Couser is correct that "[t]he reasonableness of [an officer's] actions depends . . . on whether [that officer's] own reckless or deliberate conduct during the seizure unreasonably created the need to use force." *Sevier*, 60 F.3d at 699; *Estate of Taylor*, 16 F.4th at 771 (indicating the shooting officer's actions "immediately connected with the seizure" are the relevant actions for analyzing whether he acted recklessly). But the record does not support a reasonable inference that Officer Somers acted recklessly during the seizure.[11] Officer Somers initially used non-lethal force and,

---

[11] The same cannot necessarily be said of Corporal Hawpe. The record shows Corporal Hawpe charged Mr. Holmes while he was standing still, then tackled him to ground. But in evaluating whether *Officer Somers* is entitled to qualified immunity from the § 1983 claim alleged against him, our focus is on *Officer Somers*. *See Foote* v. *Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (explaining "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation"). Ms. Couser admits as much. At oral argument, Ms. Couser conceded "to be liable each officer is assessed on their own actions." Oral Arg. at 9:20–52. And Corporal Hawpe's conduct, under our precedent did not provide "an independent basis for saying [Officer] Somers himself was unreasonable." Oral Arg. at 9:50–10:10.

when Corporal Hawpe and Mr. Holmes were scuffling on the ground, he attempted to restrain Mr. Holmes by grabbing his left arm. Those actions in the face of Mr. Holmes's sustained defiance of officers' commands and resistance to arrest did not escalate the situation, as Ms. Couser contends.

We discern no error in the district court's application of the *Larsen* factors and affirm its conclusion under the second *Graham* factor. Our analysis proceeds no further. "Having determined that there is no constitutional violation, it is unnecessary to consider whether the law was clearly established at the time of the incident." *Palacios*, 61 F.4th at 1263.

*** 

The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson* v. *Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*)). We abide by this directive, while acknowledging the challenges facing all stakeholders in cases involving the use of deadly force. Our law recognizes "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. And we cannot review the circumstances surrounding Mr. Holmes's death now "with the 20/20 vision of hindsight." *Id.* at 396.

26

At the same time, we must recognize Mr. Holmes is not here to tell his side of the story. We are thus particularly "cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" *Pauly*, 874 F.3d at 1217–18 (quoting *Abraham* v. *Raso*, 183 F.3d 279, 294 (3d Cir. 1999)). As an appellate court, our task is to resolve, with rigorous adherence to the applicable law, whether there is a "genuine issue of fact for the jury to determine." *Finch* v. *Rapp*, 38 F.4th 1234, 1242 (10th Cir. 2022). On this record, the district court correctly concluded there is none.

## IV

We affirm the district court's grant of summary judgment and qualified immunity to Officer Somers on Ms. Couser's Fourth Amendment excessive-force claim.

ENTERED FOR THE COURT

Veronica S. Rossman
Circuit Judge